Please be seated. Mr. Ranieri, I'll be happy to hear from you. Whenever you're ready, sir. Good morning. May it please the court, Rafael Ranieri, the appellate, Mr. Herman Harris. The first time this case came before the court, this court gave a simple mandate and narrowed the focus of this case. The district court was to properly construe the facts in Mr. Harris' favor and was to determine whether as to the final gunshots after Mr. Harris had fallen, whether Mr. Pittman was entitled to qualify for the duty. The district court failed to comply with this court's mandate and as a result, this court should remand and direct the district court to set a trial date. Excuse me. This court has already decided that Mr. Harris has presented evidence that contradicts Mr. Pittman's factual accounts. Indeed, this court identified a specific disputed material fact. Mr. Harris contends that he was shot four times. The second shot knocked him to the ground. He contends that Mr. Pittman observed him fall to the ground and then proceeded to fire two more shots into Mr. Harris' body. Mr. Pittman presented a contrasting, conflicting account of the material facts. He claims that he fired until Mr. Pittman fell. He contends that he didn't fire any more gunshots. Mr. Harris' claim is based on those final two gunshots as a result of the material disputed fact. We have to be a little bit careful here because the Supreme Court has been granting summary reversals for refusal to recognize qualified immunity in certain cases. And you're as familiar with those as I am. But when we deny qualified immunity in something like this, you're always running a risk up there. That's right, Your Honor. That's right. But this case falls on the right side of this court's precedence and the Supreme Court's precedence. The Waterman case and the cases we cite in our briefs demonstrate that it is possible to justify or analyze qualified immunity based on justification for force as every specific use of deadly force. So even if force was justified the first time Mr. Pittman fired his gun, it doesn't mean it was justified the final times that he fired his gun. It is possible to distinguish between those gunshots. This court's cases and the Supreme Court's cases support that sort of analysis. So your essential position here would be that in this particular instance is taking the facts in the light most faithful to the non-movie, which we do in a qualified immunity case, that you think the trial judge made an error. So tell me, how is it that the trial judge erred in that respect? So the trial judge found, first held that Mr. Harris did not meet the evidentiary standard, the evidentiary burden of producing facts that conflicted with Mr. Pittman's, that holding was incorrect. The district court then went on to perform the qualified immunity analysis, but in doing so, construed the facts in Mr. Pittman's favor rather than Mr. Harris's favor. How so? So for example, he found that, the court found that Mr. Pittman fired the gunshots rapidly. As a result, all of Mr. Pittman's actions were reasonable. There's no evidence that the shots were fired rapidly. Even if the shots were fired within, let's say, a matter of seconds, this court's precedence. I thought there were several, multiple witnesses who corroborated the statements that the shots were fired in rapid succession. And the witness testimony, if you're interested in it, can be found on JA-252 and JA-259-60. And they came in the form of affidavits and they, as I understand it, corroborated the statements of Officer Pittman that the shots were fired in rapid succession. So the witnesses do have, do state that the shots were fired, but they don't state how much time was left between the final gunshots. But didn't they basically, I mean, that's not the only piece of evidence you need to explain, but didn't they basically corroborate the opposite account? I don't believe so, Your Honor. To begin with, Mr. Pittman didn't state that, didn't state as to how long the shots took. He just said he fired his gun until Mr. Harris fell. So he has not made any statements. In looking at the record, one other thing that concerned me, the appellant in this case states that there was no struggle between himself and Officer Pittman. And yet, when you look at some of the photographs in the record, he looks pretty beaten up and covered in scratches. And then there's one picture of the man's face, which shows very clear lacerations. And in light of those photographs, isn't it a bit difficult to credit the assertion that there was no struggle between himself and the officer? See, this is the thing. It's very different. I think police officers overextend themselves on a too frequent basis. But I look at this case a little bit as at the opposite end of the spectrum from my distinguished colleague Judge Winn's wonderful opinion in the Slager case. Because there, an officer shot a gentleman in the back and then proceeded to lie about it. And here, you have a totally different situation, totally different end of the spectrum, where the officer is actually fighting for his life. When you look at the DNA marks on the handle of the weapon, where he gets beat up, he's fighting for his life. And the question is, do we give him a civil lawsuit on top of it all? And so I think you have to have a discernment between situations where officers just go way too far and those where they get beat up trying to protect us. And to my mind, this opinion and the Slager opinion that my distinguished colleague wrote are good bookends for this circuit. Good, good bookends showing discernment. That's, you're familiar with that. This is the Slager case and this is the opposite. Your Honor, we do not see this case as being the opposite of the Slager case. We think it is on that side of the line. There's no dispute that there was a struggle between. Let's identify what the issue is, as I think it is in this case. And I agree with Judge Wilkerson's statements in terms of the state of law of this. But in determining whether excessive force is used is analyzed on each shot. It may exist at the beginning of it, but if at the end, in this instance, it seems to be some evidence or the evidence seems to point. The defendant says he was lying on the ground on all when the final shot. So it really comes down to that third and fourth shot. That's what the repetition business is about. With all of the secondhand witnesses that Judge Wilkerson alluded to, the question is, did they support the notion that there was not a pause between the final shots there? And that's where this case becomes a little bit more difficult to discern the nuance than simply bookend case. Because you have those different shots. And we can accept totally the fact that it's excessive force in the first two shots. I don't think you're going to argue. I think you can credibly argue those were not shots that would fit within a proper use of force in this instance. But the contention here appears to be is that on the last shot, he was on the ground lying down. Now, whether you win this at trial is a whole different ballgame. Because it comes down to a credibility question there. But the issue here has to do is viewing that in a light most favorable to the non-moving party. Is that, and the record can sustain that. We don't have to go back and forth on that. Is that a disputed fact that renders it necessary to submit this to the next stage in the proceeding? That's exactly right, Your Honor. There's no dispute as to the first two gunshots. We don't want to claim as to the first two gunshots. This case is about the final two gunshots. And that's essentially where the struggling is happening with the first two shots. Now, it may well be at some point that the law could move and say, well, once it starts, it's a continual process. Sort of like a medical type thing. But I don't think there's a rule like that. From my understanding is each one of those shots are viewed differently in terms of is it necessary. So if you get a person and you start a process, it doesn't mean you can finish up the job once the threat is gone. And that's really the issue to be decided. And as I said, I'm not sure you win that on trial. But at this stage of the process, that appears to be a question. That's exactly right, Your Honor. The law is clear that you analyze each use of force independently. And that's the justification for each additional use of force. Can I ask you a question? A couple of things that troubled me about the district court analysis. Does it matter that even though our mandate was really clear that the relevant standard for use of deadly force is Garner, and we said apply Garner to these facts, that the district court continued to apply the Graham factors. And so the final conclusion by the district court was that it was factors two and three of Graham support the reasonableness of this. So he's including the fact of resisting arrest, which really is not part of the analysis under Garner. Is there any chance this made a difference that the district court was applying the wrong standard? I think that's right, Your Honor. And I think that it matters, especially as Judge Quinn noted, that this is as to the finals of gunshots when my client was no longer resisting arrest. He's faced down on the ground. It's not possible to be resisting anymore. He no longer poses a threat. So to incorporate that fact into the analysis does sway the analysis. It doesn't matter. There's no additional reason for his error. The district court also said that on the record it was clear that the police officer was shooting to disable and not to kill. And I'm unclear about the factual basis for that, given that there were two shots to the chest. But I'm also wondering, is it possible that the district court thought if you're shooting a gun at someone to wound and not to kill, then that is not the use of deadly force? Is that why the district court didn't apply Garner? You may not. I'll ask your colleague, too. I'm just genuinely mystified as to what's going on here. It's unclear, Your Honor. The use of force is clearly deadly. He was shot in the chest. So it's unclear what the factual basis was for that statement. We pointed out in the briefs there was no factual basis for that statement. The officer used deadly force. He admits it, but he said he was shooting for his life and, therefore, he shot to stop the threat to his life. Once Mr. Harris fell to the ground, he was no longer a threat. What is the evidence of that? What is the evidence that on the fourth shot, he was on the ground? It's Mr. Harris' statement. He says, I was on the ground. I can give you the J.A. site. J.A. 379 says the third shot knocks Mr. Harris to the ground. Once he's on the ground. Sorry, excuse me. The second shot knocks him to the ground. Once he's on the ground, Mr. Hittman observes him fall to the ground. He fires two more shots. What's interesting about this case, there's no, I don't think there's any forensic evidence here indicating where these shots are. That's right. There hasn't been a proper opportunity. I'm wondering why. There hasn't been a proper opportunity to give discovery in this case. Mr. Harris was unrepresented despite the fact that he requested counsel. I thought there was DNA evidence showing that the appellant's fingerprints were on the handle of the weapon. That's right, Your Honor. And that goes to the perhaps justification for the first shot, but not as to the final gunshots once Mr. Harris. The idea that we can completely segment these kind of encounters of something like this, I'm just not sure how that conforms to the reality of the situation. You're going down and you're tumbling down a river bank or the bank of a ravine. There's obviously a struggle. Injuries are suffered by the officer. There's at least a struggle over the weapon because fingerprints are on the handle of the weapon. You have an Alfred plea in the background in which the Alfred plea appears to contradict some of the statements that are made in this appeal. But given all of this, can we really segment this kind of thing? Or is it really when people are in this kind of struggle and life and death stakes are involved, isn't it more of a continuous sort of thing? And it doesn't seem to me to coincide with reality that there's some kind of pause here in which an officer can say, okay, this is the second stage. I mean, the man, maybe both of them, but the officers clearly had a finger on his weapon. He's fighting for his life. And if I were fighting for my life in a struggle, I would regard it as a unified struggle, not phase one, phase two of the struggle. That's just not the reality of people who are tumbling down a ravine and struggling over a weapon. I think this turns into a factual question of whether there was a long enough pause between the gunshots for the officer to reasonably realize the threat and the collapse, and that he was no longer in danger. Once that happens, the justification for force collapses, and you can't analyze them as separate acts. The Waterman case, which we set in our papers, supports that. And there was a six-second – It was the Waterman case that really is what we're talking about here. That's right. That lapse of time was like six seconds. That's right. And the court there said it's really a question – and really a common sense. It really comes down to once the threat is abated and once there's no threat, you don't have the right to employ excessive force. You can before the end. You could kill him before the end because you have a right to. But once he is – by his testimony, if you take it in a light, most favorable – and that's what we're hamstrung with here on review. We may feel differently in terms of how we would look at this. Common sense tells us to go a different way. I agree with Judge Wilkerson on that. But once we look at it in a light, most favorable, if he presents evidence that he's lying down on the ground unarmed, even though there's counter evidence and some of it's been contradicted through affidavits back and forth, it puts us in a position of we don't make that decision now. We'll allow the process to make the decision. Don't know what the decision is going to turn out to be. But we don't do it as a matter of law. That's exactly right. The interesting thing about my colleague, Judge Wynn's question is he talks about the summary judgment standard. He does not talk about the tension between the summary judgment standard and the qualified immunity standard. The summary judgment standard says that facts and inferences are for the non-moving party, but qualified immunity says that latitude has to be given in cases where the exercise of judgment, as I would certainly think, was here. And then going too deep into trial destroys the entire value of the view. So just talking about Rule 56, assuming that one assumes that there is even a genuine issue given the record in the case. But it's very difficult for me to divorce Rule 56 from the tension that exists between that rule and the qualified immunity standard. And that's what I'm hearing from you. At any rate, I'm going to ask if Judge Harris has a question for you. A clarifying question just on the state of the record and the forensic evidence. There is evidence in the record about the gunshot wounds, right, that it was two in the chest, the finger, and then one in the back of the leg. The fourth shot was to the back of the leg. That's in the record. That's right, Your Honor. Okay, thank you. We have some rebuttal time. Thank you, Your Honor. Medley's Court, good morning. My name is Brandon Christian. I have the privilege of representing Officer Zachary Pittman, who is present in the gallery in the center. Officer Pittman, on August 26, 2012, there is one undeniable fact in this case. It's established by judicial plea. It's established by the record. And that is that Herman Harris wrestled Officer Pittman's firearm away from him after it discharged in his holster, pointed it at Officer Pittman's head, and pulled the trigger. But for the grace of God and the fact that the gun went off in the holster and prevented the ejection of the shell, Officer Pittman would not be sitting in this courtroom today. Can I ask you to jump right to the thing that I find most perplexing about the district court opinion? What is the basis for the district court's conclusion that Officer Pittman was shooting only to disable? We did not advance that argument in the district court. Okay, so the answer is you don't know what the basis is. I never saw that prior to the issuance of the opinion. That's not a good argument. I'm not advancing that before this court. I didn't think you were getting anywhere near it. Yes, sir, you are correct, Your Honor. Do you have, and I know that nobody can mind read the district court, but why are we applying Graham and not Garner? Is it because the district court thought this was not a use of deadly force? I believe the district, we certainly argue that it was the use of deadly force, but that there was qualified immunity and lawful justification. All right, so we can all agree this was the use of deadly force. I think so, Your Honor. Great. But let's be clear with your opening statement. Everything you said, I want you to be clear, the court as a whole fully, fully appreciates that. An officer who's in a moment of danger, has a gun pointed at him, is entitled to use excessive force. None of that is disputed here. And as the other side has even indicated, the first two shots, there's no dispute about that. Clearly, he's entitled to do that. But what comes into mind is the Waterman application of it, is that when there are four shots, and you would probably agree as much as anyone that if there's a substantial amount of time between the first two and, say, the defendant is then handcuffed, you can't walk over and shoot him because you got a gun pointed at you earlier. That would be the extreme example. And so then it comes down to a question of fact as to whether the third and fourth, which is the point that's being advanced here, as to whether the third and fourth shot, there was substantial time there and the defendant had put himself in a position, or was in a position where the threat was abated. A question of fact, as Judge Wilkinson said, is very disturbing. But the question comes, do we as the judges make that determination, or do we allow the trial process to allow it? I think that the legal issue before the court here is whether there's any clearly established law that says when somebody who has been unarmed all the way through an encounter in the dark where you can't see them well, all of which are undisputed facts, has attempted to murder you with your own firearm and you're a police officer, you fire, he goes to the ground, you can't tell. Officer Pittman could not tell that night in that rabbit warren in the vines. Everything you're saying is very persuasive. But it is the kind of argument that would move a jury just as well one way or the other. You may win. You may win very quickly on it. But from a legal perspective, the question is, is there view in the evidence, and even though this is strictly not summary judgment but qualified immunity, we do look at the evidence in the light most favorable to the non-moving view. You agree with that, don't you? Absolutely. And doing so, if there is evidence he's lying on the ground, unarmed, not moving at that point, and there is sufficient time between that, the question is, is the fourth shot necessary to abate the threat? And it may well be, as you say, and you might want to look at it holistically and say, oh, yes. And probably the jury might spend five seconds agreeing with you. But the question is whether we as judges should make that decision in light of the existing case law. We are constrained by case law. You certainly are constrained by case law. But I could not find, and my learned colleague on the other side did not point out, any case in which somebody who was unarmed at the beginning and then unarmed at the end still was and who used the officer's own weapon against him. I think that's the qualified immunity issue that we're looking at here. Did he actually click the – did he actually pull the trigger? Your Honor, his DNA was on the trigger, not just the handle. It was on the trigger itself, which audibly clicked, and the firing pin struck the back of the dead ship. Counsel, can I just – I think I may actually be misunderstanding your argument. Are you saying that the Waterman and the Brockman case are not – sort of don't govern here because here it was clear that the plaintiff was unarmed? I'm saying that Waterman and Brockington do not – are not the applicable cases for this set of facts because in this case the threat was not – and to go to Judge Wynn's point, and I hope it answers your question as well, Your Honor. The issue is that the fact that Herman Harris fell to the ground did not in Officer Pidman's mind, and remember the qualified immunity standard says what is the reasonable officer's mind. It didn't eliminate the threat because he was unarmed at the beginning and unarmed at the end. The threat was presented by his willingness to attack an armed police officer. If you read the evidence that's been submitted in this opposition and in the complaint and you draw reasonable inferences in the plaintiff's favor, that just seems like a fact question because he's saying I got hit in the chest, spun around, and fell to the ground quite dramatically, so it would be quite obvious that he – and everyone already knew he'd lost a finger, so now he's down a finger and a chest wound and he's lying on the ground, and so absolutely argue to a jury. I didn't know that – I couldn't see that well. It all happened very fast. I thought he might stand up after his chest wound and losing his finger. I mean I have the gun now, but who knows what he'll come up with. Have at it with the jury, but that just seems like it's not something we can decide sitting here that it was still necessary to protect himself to fire the third and fourth shot. That's why I'm having trouble. And the fact that he was unarmed, I don't see how that is a good fact or helpful for you. Well, the fact is that he was unarmed at the beginning and still managed to nearly murder my officer with his own firearm. But the broader question, I think, Your Honor, is where we're coming back to the question of qualified immunity is that the Supreme Court has for decades and continues to, by my count, six times in the last four terms remind us over and over that the court system should not judge an officer's decision in the heat of battle, in the heat of the moment, with the same clarity that we as legal technicians would give 20-20 hindsight. But we have all these cases saying, you know, as Judge Wynn said, it's a matter of seconds. You're firing at the car and the first four shots are fine, and then one second later you've got to stop firing. And I'm just repeating what my colleagues have said. Totally understand that this is a really high burden to put on police officers, that you have to, like, cool down, catch yourself, and within a matter of seconds, assess the situation and understand that the threat has passed, if it has passed. But it is a burden that we impose in our cases, and that was pretty, you know, that's been clear since 2005. But only if there is sufficient time to, and in this case, there is no evidence. The plaintiff, Mr. Harris, did not deduce any evidence suggesting that there was an extended way. Why don't you go back? One of the things that distinguishes this case from others, perhaps, is the existence of the offered plea. And why don't you go back and tell us about, a little bit about that offered plea and the statements that were made during the course of the plea colloquy or tended as a matter of establishing a factual basis. Tell them what was, say, you know, say what was admitted to in the course of the offered plea proceeding. Well, Your Honor, I think what was admitted to, and just as a precursor to making sure I'm thoroughly answering the court's question, I would remind the court that this lawsuit with the complaint, the verified complaint, was filed almost two years before the defendant entered his plea. So he was aware of the statements he had previously made to the district court through his complaint. And in the plea, he stipulated to the prosecution, being able to summarize the evidence, the prosecutor offered the evidence of the struggle, the evidence of the DNA on the trigger, the pulling of the trigger while the gun was pointed at Officer Pittman's head, and the ineffectiveness of all of the nonlethal force that the officer tried to use before he employed deadly force. Again, which goes to the issue of the continuing dangerousness of Mr. Harris even after he was shot. Did he agree to all of that as a, did he assent to all of that as a factual basis for the plea? He assented to it, and when specifically asked by the court if he had any corrections or additions, he, with the assistance of counsel, knowing of the existence of this civil action, declined to make any modification of those facts. Oh, it has implication. It removes, first of all, it's a factor that wasn't present in many of our previous cases, and it removes disputed facts and puts them into the realm of admitted facts. I think that was our argument, Your Honor, in our brief, particularly with our constant references to Scott B. Harris, that the plaintiff's version of events in this case has been utterly discredited by the record. Maybe it's a question of judicial estoppel or whatever, but, you know, the matter, the whole question is whether you can play games with the court by having one set of facts to get a favorable offered plea and then coming forward with a completely different version of facts in the civil damages suit. And, you know, that way, as I say, that wasn't really present, I don't think, in any of our previous cases with this degree of clarity. And I just don't think you can have it, you know, have it both ways with directly contradictory narratives in the civil and criminal actions. Perhaps you can when you deal with an offered plea, the nature of an offered plea. In this instance, those additional facts were not necessary to sustain his plea. What he said was essentially that he would dispute at trial other instances relating to the struggle. And so in this instance, the first two shots are not contested at all. The only thing that's contested here is either the third or the fourth shot, and the question here, as in all cases, whether it's Waterton or Brockerton or any case of this sort, or any other case, even the continuing analysis is everybody agrees that if there is evidence that the threat has been abated, then you don't have a right to use excessive force. The only question then becomes, do we decide that as judges or do we allow the trial process to decide? That's the only question before us. And if we all feel like, well, this is enough, we have to think about, well, what does this mean down the road once we get into this business? If we don't analyze this as whether the evidence is sufficient for a reasonable jury to find that it was abated, then how do we analyze other cases? Well, I think the question still comes to, has there been any evidence adduced that the plaintiff can rely on? And there's no evidence in the record to suggest what the amount of time passing between the shots, other than Officer Pittman's contention that they were continuous. And also his testimony that there was enough time for Officer Pittman to get up, stand over him, and fire the last two shots. Well, I, again, don't see that as being adduced by the plaintiff as evidence, because you have the plaintiff's complaint where he says, he paged me, I fell to the ground, and he stood over me four times. You have a different set of statements. And when he said, I pulled the paper leaves out, he attempted to push the hands away. But the notarized and sworn opposition, is that not? But, again, I'm trying to figure out which. One of my struggles throughout this case has been figuring out what the plaintiff is alleging the facts are, so I could adequately respond to it. Well, then our mandate should have been helpful, right? When we said, look, here's the central factual dispute in this case. Was he standing over him, shooting down for the last two shots? And based on that, in the totality of the circumstances, given the violence of his prior attack, the attempt on Officer Pittman's life, Officer Pittman reasonably, again, without the benefit of 20-20 hindsight, in that heart-pounding, my-life-almost-ended moment, to perceive that Herman Harris continued to represent a threat, with no evidence to show that there was any break in the time, to say, I kept shooting. There's just no evidence. There's a very reasonable version of the facts that we can't argue with. The only question is, is there another version of the facts? That is, the version that he pushed for, that he got shot, spun down, was out on the ground, run off, wasn't moving, and got shot. And I would respectfully submit, Your Honor, that that version of events only comes into play, and this issue was never argued before this court or the district court, is whether or not that version of events has been so utterly discredited by the record. I think the district court implicitly adopted it without hearing arguments on it, but that has been a central part of our case here, that that version of events is utterly discredited. On your side of it, you have, when you talk about precedence, there's a wealth of precedence. It says, as you just recounted, that we are not to second-guess situations where officers are required to exercise split-second judgments. And I think, you know, the fact that there's some minor pause doesn't negate the fact that somebody had a gun put to his head and tried to kill him. I think we'd be running a terrible risk with the Supreme Court if we denied qualified immunity. That's not based on my version. It's just based on all these summary reversals that have come down from the court. And speaking of precedence, it seems to me that your strongest case is Scott V. Harris, and it speaks directly to my good colleague's desire, which is, you know, I think customarily quite sound, but that a jury needs to decide this. And here is the statement of the Supreme Court. When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion of summary judgment. When I reviewed the record in this case with some care between the offered plea and the statements that were made there, the evidence of struggle, the DNA evidence on the weapon, the corroborating witnesses about the shots being fired in sort of rapid succession, and the basic evidence opposed to that is simply the appellant's own conclusory statement at odds with his previous acceptance of guilt in the offered plea. So this is a case where Scott V. Harris has teed it up for us at the Supreme Court. And you've got a number of different pieces of evidence, particularly with the offered plea, contradicted largely by the plaintiff's own conclusory assertions. And if that isn't Scott V. Harris, then I don't know what is. Apparently the case is no longer viable. And I just say, you know, there are lots of close cases, but this strikes me as one where, you know, I would just say so to virtue that denying qualified immunity in light of the Supreme Court's precedence is taking a real chance. Can I ask you, I guess I could just ask my colleague, but I'm supposed to ask you, can you tell me which parts of the record sort of blatantly contradict in sort of the way a videotape does the Mr. Harris's statement about what happened? Because I didn't get that. Well, I think, and I think it's very important when analyzing the Scott V. Harris, the Supreme Court's phrase was when the non-moving party's version of events. So I take that as, and I think that. Oh, you think it doesn't have to be the part of the events that's sort of relevant to the final two shots. Correct. I think it looks at the totality of everything. But Judge Harris, could I follow up on something you asked? Scott V. Harris, though, what was contradicted was sort of the nub of the legal question. And here you're saying that, as I understand it, maybe there's nothing that explicitly contradicts anything about those last two shots, but some other stuff he said originally is clearly contradicted. That the totality of his version of events is so discredited that the court should not look to his version of events at all, leaving the only evidence before the court being officer's commitments. Interesting. Okay. That's why we, that's why. Okay, that's a little bit different from Scott V. Harris, but you could. Okay. And we do have the difference that this is a case in which there's a remand order, in which this court has previously looked at. And unless we're going to go back and say this court dared in some respect, we don't draw those same kind of conclusions here. There's a limitation in terms of how, what the trial judge was permitted to do in this case. We asked him to go back and look in these instances. Well, if I may follow up on that thought, which also follows up on something that you said earlier, Judge Harris. You, in fact, specifically asked both me and my colleague, did the court apply the wrong, did the lower court apply the wrong standard through Graham instead of Tennessee versus Garner? But after this court remanded this case originally, the Supreme Court handed down White versus Pauley, which is one of the per curiam decisions that Judge Wilkinson's concerned about. And in that case, the Supreme Court explicitly directed all of us that we cannot govern these cases on a general application of Tennessee versus Garner, but must do so based on the cases that have substantial similar facts in these excessive force situations. And that's the point that I kept going back to, is that we have not had a case under sufficiently similar facts as this to say that Officer Pittman knew beyond a shadow of a doubt that he was wrong. Rockington is so close, though, right? I mean, when you talk about qualified, I might remember, isn't Rockington the one where there were several shots fired while the person was a threat? The person is wounded, falls down, and the subsequent shots are held to be excessive. I mean, that's pretty, you rarely see precedent that's sort of as directly applicable. I see my time has expired. May I answer that question? Certainly. Absolutely. I appreciate that, Your Honor. I would point out two things, Your Honor. One, that Rockington, there was no record to refer back to in Rockington. That was decided at the pleading stage, not at summary judgment stage, and therefore there was no discovery. In fact, part of the court's holding was whether or not the officer continued to reasonably fear for his life when he fired those shots standing over him is an issue that will be adduced through discovery. And again, in Rockington, you had a case where he was acquitted in state court of ever possessing a firearm. In our case here, Mr. Harris pleaded guilty to possessing the firearm. In addition to all those factors, in Rockington, there was no prior physical struggle as I understand it. And the officer in that case had sustained no injuries. Had the officer in that case been kidnapped by the plaintiff? I believe my understanding is that there was a third party kidnapping, but I could be wrong. I was focused on, when I reviewed Rockington, I was focused on the time of the shooting. But I agree there had been no physical struggle with Judge Wilkinson. And I thank the court for the time in hearing from me. Hold on for one second. I'm going to ask my colleagues if they have further questions. Pam, do you have any questions? We thank you very much. Thank you, Your Honor. And the appellant here is entitled to some rebuttal time. Thank you, Your Honor. This case needs to go back to the district court to develop a factual record. There has been no meaningful discovery by the plaintiff. He's been imprisoned. He is in proceeding pro se. You're not appealing the failure to appoint counsel, are you? We have not appealed that, Your Honor, no. It is within this court's power to direct the district court to appoint counsel, but we have not. It seems like if this case, just hypothetically, were going to go back, it would be a good idea to get a lawyer in the picture. We agree with you, Your Honor. My opposing counsel's arguments demonstrate the existence of multiple factual disputes. He claims that Officer Pittman didn't realize that Mr. Harrison fell to the ground. Mr. Harrison contends otherwise. It's essential material factual dispute in this case. Moreover, the Alford plea that Judge Wilkinson raised does not relate to the final bench-off. It wasn't addressed. Can I ask you a question? What role did the Alford plea play in the district court? Was this an issue in the district court? I don't believe so, Your Honor. It wasn't a part of the district court's opinion. Right. Was it raised in the district court? Did Officer Pittman rely on it in the district court? I'm not aware, Your Honor. I don't know that. I could go back and look. Either way, Mr. Harrison's counsel before the plea court made clear that if this had gone to trial, as Judge Harrison noted, they would raise other issues. They would dispute other facts. It just wasn't relevant to the plea. So there's no evidence in the record that contradicts Mr. Harrison's contention that he fell to the ground, that Mr. Pittman stood over him and fired two more gunshots. Nothing in the record contradicts that, so he's been consistent as to that. The idea that Scott stands over him is a proposition that you consider Mr. Harrison's testimony writ large, and whether that discredits him is incorrect. As Judge Harrison pointed out, Scott relates to whether the material facts have been contradicted, and they haven't been here. Whether Mr. Harrison is found to be not credible is a jury's question. It's a factual dispute. We would also point out that right here has been clearly established. Brockington and Waterman make that plain. What matters is how those cases are articulated to the right. In addition to being factually similar, they articulate it in such a way that a reasonable officer would be on notice that once someone has fallen to the ground and is no longer a threat, you cannot continue to use deadly force. Do you have anything further, sir? No, the court has no other questions. Jim? No. Pam? Thank you, Your Honor. We will come down and brief counsel. I see you're court-appointed, Mr. Ranieri, and I'd like to thank you and express the court's appreciation for your services. Thank you, Your Honor. We'll move directly into our next case.
judges: J. Harvie Wilkinson III, James A. Wynn Jr., Pamela A. Harris